# In re Maria Diel, Kathleen Lafleur, Michael McSweeney, Bernard Parrott, Christine Cushion, Cheryl Arbuckle, Sandra Kirkpatrick and Jane Bingham

[614 A.2d 1223]

No. 91-097

Present: Allen, C.J., Gibson and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned

Opinion Filed June 19, 1992

*Thomas F. Garrett*, Vermont Legal Aid, Inc., Burlington, for Plaintiffs-Appellants.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Donelle Smith Staley*, Assistant Attorney General, Waterbury, for Defendant-Appellee.

**Gibson, J.** Petitioners appeal from a decision of the Human Services Board denying them recalculated welfare benefits for four months in 1989. They argue that the rescission by the Department of Social Welfare of a policy change that made them eligible for higher monthly payments under the Aid to Needy Families with Children (ANFC) program was void because it violated due process and the Vermont Administrative Procedure Act (APA). We reverse.

On January 30, 1989, the Department instructed its district offices not to consider federal fuel and utility subsidies when calculating the income of ANFC recipients. This instruction reversed prior policy, under which the subsidies were considered income. It raised the prospect of higher payments for approximately 750 ANFC recipients who received the subsidies, because ANFC payments increase as income decreases. See 33 V.S.A. § 1103(a); Code of Vermont Rules 13170003, at 83-104. The Department, however, did not have sufficient funds to pay higher benefits immediately to all ANFC recipients affected by the change, so it instructed the district offices to implement the change gradually as they reviewed recipients' files. Of the seven petitioners herein, only petitioner McSweeney received a higher ANFC payment under the change.

As the new policy became effective, Vermont Legal Aid, Inc. threatened to sue the Department to force it to implement the change immediately for all recipients, arguing that the "phase-in" violated equal protection. Seeking to avoid litigation, the

Department on February 23, 1989 instructed the district offices to revert to the original policy of considering the fuel and utility subsidies as income. On July 1, 1989, the Department reinstated the change for all recipients. At no time did the Department provide opportunity for public input.

After the Department rescinded the change in February, petitioners sought "fair hearings" under 3 V.S.A. § 3091. They conceded that whether to count fuel and utility subsidies as income was within the discretion of the Department. They argued, however, that the initial policy change should have been implemented simultaneously for all recipients, and that rescission of the change without notice or hearing violated due process and the APA, 3 V.S.A. §§ 801–849. They sought recalculation of the benefits for the period between February and July, with utility subsidies excluded from income. The Board agreed that the phase-in was illegal, and ordered that petitioners be awarded the benefit of the change for the month of February. The Board also ruled, however, that petitioners had not established a property right sufficient to trigger due process protection and that the APA should not be construed to invalidate the Department's rescission of its policy change. "An administrative agency's conclusions of law will be upheld on appeal if they are fairly and reasonably supported by findings of fact, and absent a clear showing to the contrary, any decisions it makes within its expertise are presumed correct, valid and reasonable." *Caledonian Record Publishing Co. v. Department of Employment & Training*, 151 Vt. 256, 260, 559 A.2d 678, 681 (1989) (citations omitted). In the present case, the questions before the Human Services Board concerned the requirements of due process and the APA, areas of the law that are not directly within its expertise in welfare administration. Hence, we look to see if the Board's conclusions are fairly and reasonably supported by findings of fact, without presuming that they are correct. See *id.* The Board's findings are consistent with the undisputed facts. Because they do not support the Board's conclusions of law, however, we reverse.

## I.

The Department first argues that petitioners lack standing to challenge its policy change, and that this Court therefore

lacks jurisdiction to hear their appeal. The Department claims that "[p]etitioners merely hoped to benefit in the future" under the policy of excluding utility subsidies from income, and that the disappointment of such hopes is not a justiciable legal injury. We disagree.

The Department cites *Sierra Club v. Morton*, 405 U.S. 727 (1972), where the United States Supreme Court held that the Sierra Club lacked standing to challenge a major development proposed for federal land. The Court determined that the organization had not alleged an "injury in fact" because it had not stated in its pleadings that its members used the land. *Id.* at 734–41. The Court therefore declined to reach the merits of the appeal on the grounds that the appellant had not been "aggrieved" within the meaning of the federal Administrative Procedure Act. *Id. Sierra Club* does not support the Department's position. Petitioners obviously "use" their benefits to meet their day-to-day living expenses. The Board's decision to uphold the rescission of a policy change that would have increased the benefits is thus a legal injury sufficient to make the petitioners "aggrieved" within the meaning of the APA. 3 V.S.A. § 815(a) ("A person who . . . is aggrieved by a final decision . . . may appeal . . . to the supreme court . . . ").

Nor do the Vermont cases cited by the Department advance its claim. First, in *In re Great Eastern Building Co.*, 132 Vt. 610, 326 A.2d 152 (1974), the appellants claimed a right to be free from increased traffic flow as the basis for their standing to take part in an Act 250 proceeding where they had been denied party status. This Court rejected the argument, reasoning that the appellants' concerns were subsumed by the criteria of Act 250, and that they thus had not suffered a legal injury. *Id.* at 613–14, 326 A.2d at 154. No such mechanism exists to protect the petitioners from the policy change that they challenge, and *Great Eastern* is thus inapposite.

Second, in *In re Woods*, 133 Vt. 126, 330 A.2d 94 (1974), the appellant challenged the termination of her tenancy in a public housing project. This Court ruled that she could not pursue an appeal because she had not pursued an available trial de novo. *Id.* at 127, 330 A.2d at 95. In contrast, petitioners herein have pursued their grievance through "fair hearings," and are properly before this Court under 3 V.S.A. §§ 815(a) and 3091(f).

## II.

Since the United States Supreme Court's landmark decision in *Goldberg v. Kelly*, 397 U.S. 254 (1970), the question of what administrative procedures satisfy due process under the Fifth and Fourteenth Amendments to the United States Constitution has been thrown open. In *Goldberg*, the Court recognized that welfare benefits are a matter of statutory entitlement for those qualified to receive them, *id.* at 262, and required New York State officials to provide an evidentiary hearing before terminating a person's benefits. *Id.* at 264. Subsequently, in *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976), the Court held that a recipient of Social Security disability payments was not entitled to a pretermination hearing, and that existing procedures, including a post-termination evidentiary hearing plus subsequent judicial review, adequately protected such an individual's rights. *Id.* at 349. The Court employed a three-pronged balancing test, weighing the respective interests of the government and the individual affected. *Id.* at 335. A major factor in its analysis was that Social Security recipients are not likely to have as great a level of financial need as welfare recipients. *Id.* at 340–41. In another leading decision, *United States v. Florida East Coast Ry.*, 410 U.S. 224, 241–46 (1973), the Court "implicitly" held that the provision of notice and an opportunity to file statements of position, submissions of evidence and other relevant observations was sufficient to satisfy due process under the "hearing" requirement of agency rulemaking procedures, which the Court contrasted with the adjudication of disputed facts. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L. Rev. 1267, 1307 (1975); see also *Provost v. Betit*, 326 F. Supp. 920, 924 (D. Vt. 1971) (no due process violation where state provided notice but no hearing to ANFC recipients whose benefits were reduced under Department's statewide change of policy); *Ratepayers Coalition of Rochester v. Rochester Electric Light & Power Co.*, 153 Vt. 327, 330–32, 571 A.2d 606, 608–09 (1989) (no due process violation where utility gave statutory notice of proposed rate increase to Public Service Board and Department of Public Service, but not to individual ratepayers).

In the present case, petitioners were entitled to the protection of due process when the Department decided to rescind

its policy change without notice. Inasmuch as the Department's decision affected "the very means by which to live," it could not be implemented unilaterally without violating due process. *Goldberg*, 397 U.S. at 264. We decline to delineate the exact procedures due process requires when an agency makes such a decision, however, because we find that the Department's action fell within the definition of rulemaking under the APA, which provides procedures that adequately protect petitioners' rights.

## III.

■■   The Legislature has authorized the Commissioner of the Department of Social Welfare to issue regulations necessary to administer the laws for which she is responsible. 33 V.S.A. § 105(c)(1), (2). It has not provided the Department an exemption from complying with the APA. Hence, the Commissioner must adopt rules in the manner prescribed by the APA. 3 V.S.A. § 831(a); see 3 V.S.A. §§ 836–843 (rulemaking procedures providing for publication, hearings, and legislative review). The APA does not exempt rules concerning benefits from its coverage. See 3 V.S.A. § 832 (exemptions from rulemaking). But cf. 5 U.S.C. § 553(a)(2) (any "matter relating to . . . benefits" is exempted from federal Administrative Procedure Act). Therefore, unless we conclude that the Department's change of policy did not constitute rulemaking, it is invalid. 3 V.S.A. § 846 (failure to follow APA "shall prevent a rule from taking effect").

■   Under the APA, a "rule" is an "agency statement of general applicability which implements, interprets, or prescribes law or policy." 3 V.S.A. § 801(b)(9). On its face, this broad definition encompasses the Department's decision to include utility subsidies in income. The decision interpreted the statute authorizing the ANFC program and both prescribed and implemented a policy intended to apply generally to a class of ANFC recipients. Further, authority from outside Vermont construing similar administrative procedure statutes supports the conclusion that the Department's decision constituted rulemaking. See, e.g., *Stratford Nursing & Convalescent Center v. Division of Medical Assistance & Health Services*, 215 N.J. Super. 479, 483, 522 A.2d 442, 444 (1986) (agency "policy" affected Medicaid reimbursement of all similarly situated nursing homes and should have been adopted pursuant to administrative procedure

act);* *Hillcrest Home, Inc. v. Commonwealth Department of Public Welfare*, 123 Pa. Commw. 289, 294–99, 553 A.2d 1037, 1040–42 (1989) (change in agency's interpretation of "year" to mean calendar year instead of fiscal year was substantive change in regulation that could not be accomplished outside rulemaking procedure); Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L. Rev. 731, 826–32 (1975) (discussing "inclusionary generalization" of definition of "rule"). Nonetheless, the Department argues that this conclusion leads to an irrational and illegal result.

The Department first argues that if we conclude that the rescission of the policy violated the APA, then we must conclude that its implementation was also invalid, because the initial decision to exclude utility subsidies from income was not made through rulemaking. To find otherwise would be irrational, the Department contends, citing *In re Telesystems, Corp.*, 143 Vt. 504, 469 A.2d 1169 (1983). In *Telesystems,* this Court rejected an APA challenge to a decision of the Vermont Public Service Board, which had stated that its "policy" was to require cable television companies to provide channel converters to their customers. *Id.* at 510–11, 469 A.2d at 1172–73. After reviewing the

---

* The Supreme Court of New Jersey has identified the following "relevant feature of administrative rules . . . [that] preponderate in favor of the rulemaking process":

> the agency determination . . . (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

*Metromedia, Inc. v. Director, Division of Taxation*, 97 N.J. 313, 331, 478 A.2d 742, 751 (1984). The challenged policy change in the present case has all of these features, although it is arguable that the class of ANFC recipients who also received utility subsidies was a "narrow select group."

Board's order, the Court concluded that the statement applied only to the case before the Board, and had no general applicability that would bring it within the APA's definition of "rule." *Id.* The Court wrote that the APA "should not be so literally or strictly construed that [agencies' adjudicative] powers are limited to a degree leading to irrational consequences." *Id.* at 510–11, 469 A.2d at 1172.

In the present case, neither the original implementation nor the reimplementation of the Department's policy in July have been challenged. This is hardly surprising, given the fact that only the decision to resume the practice of including fuel and utility subsidies in income adversely affected petitioners. The question under *Telesystems*, then, is whether applying the APA to invalidate only the challenged policy change is irrational. We conclude that it is not. Petitioners cannot be expected to advance arguments against their interests, and the argument they have raised is well founded. As the Human Services Board noted, there would have been no conflict over the Department's calculation of income if it had followed the APA throughout the process.

Next, the Department argues that invalidating its decision would produce an illegal result. This contention is based on the Department's reading of 33 V.S.A. § 1103(a) (formerly § 2703), which provides in part that "[i]n no case may the department expend state funds in excess of the appropriations for the programs under this chapter." The Department argues that to invalidate its decision would "lock-in" its prior error of committing unavailable funds to aid recipients. The Department's error, however, was its decision to implement its policy change gradually, which triggered Legal Aid's threat to file an equal protection suit. That threat, in turn, spurred the Commissioner to drop the change entirely until the following fiscal year, when sufficient funds presumably were available. Our holding that petitioners are entitled to recalculated ANFC benefits for part of 1989 will impose a fiscal burden on the Department that it will have to handle under a current budget. The Department has conceded its error in implementing its policy change gradually. It cannot now argue that petitioners are not entitled to relief solely because it did not have adequate funds in 1989 to exclude utility subsidies from the income of all qualified ANFC recipients.

*Reversed.*